OPINION OF THE COURT
Michael D. Stallman, J.
In this CPLR article 78 proceeding, petitioner, a former veteran police officer, seeks to annul respondents’ determination that he was automatically terminated as a police officer by operation of law due to his guilty plea to the class A misdemeanor of offering a false instrument for filing in the second degree; that he was not entitled to a hearing; and that he was therefore not eligible to retire and collect his pension.
Background
Petitioner Richard Depamphilis was a member of the New York City Police Department (NYPD) for 26 years, beginning in 1984, and the NYPD awarded him a Meritorious Police Duty medal in 1985. In 1986, petitioner was assigned to the NYPD’s Mounted Unit.
In 2006, petitioner was one of five committee members responsible for receiving applications and making recommendations to the NYPD Contract Administration Unit regarding contract bids to become a vendor to care for retired NYPD *517 horses. One of the vendors who submitted an application was Vicky Nanninga, a friend of petitioner, for the Stone Horse Inn, a horse farm. According to respondents, the contract required a minimum of 30 acres. Nanninga’s application stated that the Stone Horse Inn had 35 acres of land, when it had only 19 acres.[1]
Petitioner recommended that Nanninga be awarded a contract, and the Contract Administration Unit awarded the Stone Horse Inn a contract in the amount of about $2.5 million. Respondents assert that petitioner did not disclose his personal relationship with Nanninga, and that he was the only committee member assigned to visit the Stone Horse Inn prior to recommending that Nanninga be awarded a contract. In 2007, petitioner was promoted to the position of Detective Specialist.
On March 12, 2010, petitioner and Nanninga were arrested, and both pleaded guilty to one count of offering a false instrument for filing in the second degree, a class A misdemeanor (Penal Law § 175.30). As part of the plea agreement, petitioner and Nanninga were jointly required to pay $25,000 to the NYPD as restitution, and were precluded for life from submitting public bids, or applying for contracts or working for any agency of the City or State of New York. Nanninga was required to forfeit her contract with the NYPD to provide for the care of retired NYPD horses. Petitioner agreed to file for service retirement from the NYPD. Both defendants agreed that their job duties at any corporation, individual, joint venture, subcontractor, or any other employer would not include “any direct or indirect work related duties that connect to or affect the employer’s business with the City or State of New York and its agencies,” if ever defendants’ employer or future employer did business with the City or State of New York. (Verified answer, exhibit 3; People v Depamphilis, Crim Ct, NY County, Mar. 12, 2010, Sciarrino, J., docket No. 2010NY019168.)
Petitioner was also served with formal departmental disciplinary charges. It is undisputed that this was the first time in petitioner’s career that he was served with formal departmental disciplinary charges. The charges and specifications, dated March 15, 2010, charged petitioner with the following:
“Said Detective Richard Depamphilis, assigned to the Mounted Unit, on or about and between March *518 15, 2006 and December 31, 2006, while acting individually and in concert with Vicki Nanninga, knowing that a written instrument, to wit, an application for vendors to care for horses retired from the Department’s Mounted Unit, contained false information, offered and presented it to the Assistant Commissioner of the Contract Administration Unit, a public office, with the knowledge and belief that it would be filed with the Assistant Commissioner of the Contract Administration unit, and become part of the records of such public office.” (Answer, exhibit 4.)
Petitioner apparently executed a “Negotiated Settlement,” dated June 3, 2010, which states, in pertinent part:
“I understand that if this Negotiated Settlement is approved by the Police Commissioner, the penalty against me will be as follows:
“I shall forfeit all time, pay, and benefits for the period while under suspension, to wit: from March 12, 2010 to April 12, 2010, for a total of thirty-one (31) days; and
“I shall forfeit twenty-nine (29) vacation days. This is a combined total of sixty (60) penalty days.
“Respondent agrees to immediately file for SERVICE RETIREMENT. Respondent will not file for SERVICE RETIREMENT unless and until this Negotiated Settlement is approved by the Police Commissioner. Respondent agrees not to withdraw or rescind the application for a SERVICE RETIREMENT once filed pursuant to this Negotiated Settlement.” (Verified answer, exhibit 5.)
Petitioner and his attorney also apparently signed a document (which respondents refer to as an acknowledgment), dated June 3, 2010, which states, in pertinent part:

“NOTE: THIS AGREEMENT IS SUBJECT TO APPROVAL OF THE POLICE COMMISSIONER

“In the event that . . . any agreement concerning a proposed penalty is rejected by the . . . Police Commissioner, no statements by the Respondent or/his her Attorney made in connection with this agreement, will be admissible against the Respondent. The Respondent’s rights and privileges will remain unaffected, and the Department’s disciplinary pro *519 cess will proceed as if plea negotiations had never taken place. Additionally, it is understood that the Police Commissioner retains all rights, privileges, and discretion granted him under applicable law as if plea negotiations had never taken place.” (Verified answer, exhibit 6.)
Respondents admit that the NYPD Department Advocate recommended approval of the negotiated plea agreement, which was endorsed by First Deputy Commissioner Rafael Pineiro. However, on November 29, 2010, Police Commissioner Kelly disapproved the negotiated plea.
In a memorandum dated November 29, 2010, Police Commissioner Kelly set forth his finding that petitioner had automatically vacated his position pursuant to Public Officers Law § 30 (1) (e) when he pleaded guilty on March 12, 2010 to Penal Law § 175.30.
The memorandum states, in pertinent part:
“On its face, the crime of Offering a False Instrument for Filing in the Second Degree is one of willful deceit and a calculated disregard for honest dealings. Commission of this crime violates a public officer’s oath of office . . .
“[Petitioner] was a member of the Mounted Unit Evaluation Committee that was responsible for selecting three farms to stable retired Department horses. Eleven vendors filed applications for contracts as part of the competitive bidding process. The [petitioner] knew that Vicki Nanninga had filed an application that contained false information with the public office of the Department’s Agency Chief Contracting Officer (ACCO), a public servant. The Respondent knew that the actual size of Ms. Nanninga’s farm was smaller than the number of acres of pasture and forest that she claimed to own on the filed application. The [petitioner] was aware that Ms. Nanninga’s farm did not meet the minium requirements to bid on a contract. . . .
“However, even if the [petitioner] had not been convicted of a crime that violated his oath of office, based upon a review of the Department records and documents in this matter, I would not approve the negotiated penalty . . .
“The [petitioner] committed the misconduct for which he is charged while on duty and in the per *520 formance of his official duties . . .
“The [petitioner’s] admitted misconduct violated his express obligations as a member of the evaluation committee. The [petitioner] knew that his girlfriend, Ms. Nanninga, had filed an application with the Department’s AGCO in which she lied in order to qualify for a contract to stable retired horses. He did not disclose to anyone that he had a personal relationship with a potential vendor, nor did he request to be excused from the committee due to a conflict of interest. ...
“Having visited Stone Horse Inn, Ms. Nanninga’s farm, prior to the solicitation period, the [petitioner] was aware that the farm was between 19 and 20 acres in size at the time she filed her application, not 35 acres as she claimed in her bid. The [petitioner] also knew that the solicitation specifications required that a farm have a minimum of 30 acres of pasture in order to qualify for a contract. He did not disclose to the committee that Stone Horse Farm [sic] did not meet the specifications required for a contract award. Instead, as the only member of the committee who was responsible for conducting on-site inspections of the farms in order to verify the information contained in the applications, the [petitioner] prepared evaluation packages for the committee that did not reveal the actual size of Stone Horse Farm [sic] . . . The [petitioner] has acknowledged that the committee would not have rated Stone Horse Farm’s [sic] qualifications as it did except for the fact that he knew her.” (Verified answer, exhibit 9.)
By letter dated December 9, 2010, Assistant Commissioner Arnold S. Wechsler notified petitioner that his position as a member of the NYPD had been vacated pursuant to Public Officers Law § 30 (1) (e). (Verified answer, exhibit 10.)
This article 78 proceeding followed. Petitioner argues that respondents’ dismissal of petitioner, without a hearing or any other due process protections, was arbitrary, capricious, unlawful, and an abuse of discretion. Petitioner contends that respondents improperly relied upon Public Officers Law § 30.
I.
Public Officers Law § 30 (1) (e) provides that “[e]very office shall be vacant upon . . . conviction of a felony, or a crime *521 involving a violation of his oath of office . . . .” Generally speaking, the New York State Constitution requires public officers to swear to “faithfully discharge the duties of the office.” (NY Const, art XIII, § 1.) It is undisputed that petitioner took an oath of office substantially in that form. (Tr of Feb. 12, 2012 oral argument at 3-5.) It is undisputed and well-settled that the Public Officers Law applies to police officers of the New York City Police Department, who are considered “local officers,” as defined in Public Officers Law § 2. (People ex rel. Werner v Prendergast, 206 NY 405, 409 [1912].)
In Matter of Duffy v Ward (81 NY2d 127, 131 [1993]), the Court of Appeals discussed the policy concerns of Public Officers Law § 30 (1) (e):
“Summary termination is not a punishment for the officeholder’s crime, and reversal of the conviction on appeal does not automatically entitle the officeholder to return to the vacated position. Rather, the statute’s requirement that the office be vacated on conviction reflects two legislative concerns. First, as a practical matter, governmental work should not go unattended, or a position unfilled, while a convicted officeholder pursues a potentially lengthy appeal. Second, and more fundamentally, the public has a ‘right to rest assured that its officers are individuals of moral integrity in whom they may, without second thought, place their confidence and trust’. Although the result of implementing the statute is sometimes harsh, it is clear that ‘the balance must be struck in favor of the public’ when the officer’s interest is weighed against that of State’s citizens.” (Citations omitted.)
“[W]hen an officer is convicted of a felony or an ‘oath of office’ crime the result is automatic expulsion under Public Officers Law § 30 (1) (e). If the Commissioner claims that a particular crime falls under the ‘oath of office’ category, he may proceed under Public Officers Law § 30 (1) (e) and the issue will be determined in accordance with Matter of Duffy v Ward (supra). For other convictions an administrative hearing is required pursuant to Administrative Code § 14 115 (b) as a basis for dismissal of a tenured police officer.” (Matter of Foley v *522 Bratton, 92 NY2d 781, 789 [1999],)[2]
Here, petitioner pleaded guilty to the class A misdemeanor of offering a false instrument for filing in the second degree. (Penal Law § 175.30.) Generally speaking, the entry of a guilty plea constitutes a conviction (CPL 1.20 [13]), and so it does for the purpose of Public Officers Law § 30 (1) (e). (See e.g. Matter of Bowman v Kerik, 271 AD2d 225, 225 [1st Dept 2000] [petitioners pleaded guilty to misdemeanor under Tax Law § 1801 (a)]; Matter of Holt v Marinelli, 45 AD3d 1317, 1317-1318 [4th Dept 2007] [petitioner pleaded guilty to misdemeanor under Tax Law § 1817 (b) (1)]; Matter of Papa v DeLuca, 160 AD2d 876 [2d Dept 1990] [petitioner pleaded guilty to a felony].) Therefore, the issue of whether petitioner should have been granted a pretermination hearing turns on whether or not petitioner’s crime was “a crime involving a violation of his oath of office,” which would result in automatic termination pursuant to Public Officers Law § 30 (1) (e).
As a threshold matter, the parties disagree as to whether Matter of Duffy v Ward (81 NY2d 127 [1993], supra) should apply here. In Matter of Duffy, the petitioner, a New York City police officer, was found guilty of the misdemeanor of criminal trespass in the second degree after an off-duty scuffle with another man. Respondents contend that the holding in Matter of Duffy is limited to convictions committed for off-duty conduct. *523 Matter of Duffy articulated a standard for analyzing whether a misdemeanor conviction constitutes a crime constituting a violation of the oath of office under Public Officers Law § 30 (1) (e). Although the underlying conviction in Matter of Duffy was based on conduct that arose outside the line of duty, the Matter of Duffy standard is applicable irrespective of whether the underlying conduct was either on-duty or off-duty.
Respondents contend that the conviction of any misdemeanor committed while a police officer is on duty constitutes a crime involving a violation of the oath of office. However, the Court of Appeals rejected that reasoning in Matter of Duffy:
“[I]t might well be thought that any criminal conduct, undertaken knowingly, would violate the oath. That construction of the statute could not have been intended by the Legislature, however, for it would effectively read out of the statute the limiting language of the phrase, ‘a crime involving a violation of his oath of office’ (emphasis added). Instead, meaning must be found in the underlying rationale for the statute. . . .
“Thus, reading Public Officers Law § 30 (1) (e) as reaching only those misdemeanors that demonstrate a lack of moral integrity construes the provision in a manner consistent with the statute’s underlying purposes and, at the same time, gives practical effect to the Legislature’s manifest intention to draw some limits on the invocation of summary dismissal. .. .
“[I]t may be impossible to demarcate the precise boundaries of the term, but we note that ‘integrity’ has been defined as ‘freedom from every biasing or corrupt influence or motive.’ As Chief Judge Cardozo said of the term ‘dishonesty’, the critical consideration is ‘an infirmity of purpose.’ For a crime to be one demonstrating a lack of moral integrity, it must be one involving willful deceit or a calculated disregard for honest dealings. More than intent or a criminal mens rea is needed for summary dismissal; there must be an intentional dishonesty or corruption of purpose inherent in the act prohibited by the Penal Law.” (Matter of Duffy, 81 NY2d at 134-135 [citations omitted].)
Thus, under Matter of Duffy, a police officer who commits a misdemeanor while on duty has not automatically committed a *524 crime “involving a violation of the oath of office,” simply because the crime was committed while on duty.
Offering a false instrument for filing in the second degree occurs when, “knowing that a written instrument contains a false statement or false information,” a person “offers or presents it to a public office or public servant with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become a part of the records of such public office or public servant.” (Penal Law § 175.30.)
Petitioner argues that the degree of his conduct was not so heinous so as to rise to the level required to be considered a violation of his oath of office. Petitioner contrasts his misdemeanor conviction to the felony of offering a false instrument for filing in the first degree, which requires an intent to defraud. (Penal Law § 175.35.) Petitioner points out that offering a false instrument for filing in the second degree (Penal Law § 175.30) requires knowledge that the written instrument contains a false statement, which petitioner contrasts with the situation where one intentionally files a false statement. Petitioner seeks to take refuge in the language in Matter of Duffy that “[mjore than intent or a criminal mens rea is needed for summary dismissal; there must be an intentional dishonesty or corruption of purpose inherent in the act prohibited by the Penal Law.” (Matter of Duffy, 81 NY2d at 135.)
Petitioner’s argument is unpersuasive. First, any felony conviction results in automatic expulsion of the convicted public officer pursuant to Public Officers Law § 30 (1) (e); there need be no inquiry as to whether the felony involves a violation of the oath of office. Second, the language that petitioner cites must be read in context with the prior sentence, which states, “For a crime to be one demonstrating a lack of moral integrity, it must be one involving willful deceit or a calculated disregard for honest dealings.” (Matter of Duffy, 81 NY2d at 135 [emphasis supplied].) Here, “a calculated disregard for honest dealings” is inherent in the elements of the crime to which petitioner pleaded guilty. The act of offering a false instrument for filing in the second degree is a “corruption of purpose.” (Id.)
To the extent that the language “[mjore than intent or a criminal mens rea is needed for summary dismissal” in Matter of Duffy could be interpreted as applying only to crimes whose elements require a person to act “intentionally” (see Penal Law § 15.05 [definitions of culpable mental states]), such an interpretation would conflict with Matter of Feola v Carroll (10 NY3d *525 569 [2008]). In Matter of Feola v Carroll, the Court of Appeals ruled that a police officer’s conviction of the class A misdemeanor of endangering the welfare of a child (Penal Law § 260.10 [1]), based on off-duty conduct, was a crime involving a violation of the oath of office. As respondents point out, the culpable mental state for the offense of endangering the welfare of a child is that the person acted “knowingly,” which is the same culpable mental state as is required by offering a false instrument for filing in the second degree.
II.
Not only do the elements of the subject statute conform to the Duffy analysis, but petitioner’s guilty plea allocution in Criminal Court also amply demonstrates petitioner’s calculated disregard for honest dealings:[3]
“the court: People, you may begin with Defendant Depamphilis.
“Is it true that on or about March of 2006, you, acting in concert with your co-defendant, Vicky Nanninga, that you and your co-defendant shared purpose and intent in the action that I’m about to describe, beginning on March 2006, you and your co-defendant filed a written contract application with the NYPD Contract Administration Unit, in the County of New York, and that application was on behalf of the Stone Horses [sic], a company *526 owned and operated by Vicky Nanninga to care for horses retired from the NYPD. Is that true?
“defendant depamphilis: Yes.
“the court: Is it also true that at the time the application was submitted, you knew the application would become part of an official record of the Contract Administration Unit, which is a public office located here in New York City County; is that true?
“defendant depamphilis: Yes.
“the court: Is it also true that you submitted the application with false information, specifically ‘Stone Horses has 35 acres of land,’ when in reality the property only had 19 acres of land; is that true? “defendant depamphilis: Yes.
“the court: And is it true that at the time the application was submitted you knew and was [sic] aware that the application contained that false statement?
“defendant depamphilis: Yes.” (People v Depamphilis, Crim Ct, NY County, Mar. 12, 2010, Sciarrino, J., docket No. 2010NY019168.)
Therefore, upon his guilty plea, petitioner was automatically terminated from service as a police officer by operation of Public Officers Law § 30 (1) (e). Because Public Officers Law § 30 (1) (e) is a self-executing statute, no pretermination hearing was required or appropriate. (Matter of Bowman v Kerik, 271 AD2d 225 [2000], supra.)
III.
Petitioner’s remaining arguments lack merit. Petitioner’s automatic termination is not a disciplinary punishment. (Matter of Duffy v Ward, 81 NY2d at 131 [“Summary termination is not a punishment for the officeholder’s crime”].) Therefore, petitioner’s reliance upon Civil Service Law § 75 is misplaced. In any event, “the New York City Police Commissioner’s power to discipline members of the force is governed by the Administrative Code, ‘not by section 75 of the Civil Service Law.’ ” (Matter of Montella v Bratton, 93 NY2d 424, 430 [1999], quoting Matter of Scornavacca v Leary, 38 NY2d 583, 585 [1976].) Consequently, petitioner’s argument that the automatic termination “shocks the conscience,” which is the standard of judicial review applicable to a penalty, is inapposite. Automatic *527 termination means the office becomes vacant; there is no penalty to be imposed, and thus there is no penalty subject to review.
Petitioner attempts to evoke sympathy by pointing to his prior service record, but the elements of the crime, and petitioner’s underlying conduct, involved on-duty misconduct of a serious nature. “[U]nder no circumstances could facts unique to the incident mitigate the violation of the public trust confirmed by, and arising from, the criminal conviction.” (Matter of Duffy, 81 NY2d at 133.) Thus, petitioner’s service record has no bearing on whether his misdemeanor conviction was a crime involving a violation of his oath of office.
Petitioner seems to consider his conduct as a well-motivated technical misstatement that became accurate later.[4] It may not be so characterized. Rather, petitioner actively concealed his private relationship with Nanninga and vouched for her while he had the official responsibility for investigating her application. This misuse of public position for private gain exemplifies violation of the oath to faithfully perform the duties of the office.
Moreover, had the application been truthful, the Stone Horse Inn would have been disqualified, and the publicly-bid contract would have been awarded to another vendor. Petitioner, who had the responsibility for overseeing the integrity of the contract bidding process as part of his official duties, knowingly corrupted the bidding process by favoritism. Petitioner did so by knowingly participating in the filing of the false document, inherently a deceitful act evidencing a calculated disregard for honest dealings.
In light of the court’s determination, the court does not consider respondents’ alternative argument that petitioner forfeited his office pursuant to New York City Charter § 1116. The court notes that this ground was not invoked in the notice of dismissal sent to petitioner.
Conclusion
Petitioner’s conviction by guilty plea automatically caused his office to become vacant because his crime constituted a violation of his oath of office. Respondents’ recognition of petitioner’s automatic termination was neither arbitrary nor capricious, nor in violation of law.
*528 Accordingly, it is hereby adjudged that the petition is denied and the proceeding is dismissed.

. According to petitioner, at the time the application was submitted, Nanninga was in contract to acquire a farm in Pennsylvania composed of 36 acres, and there was a small time lapse between the acquisition of the horses and Nanninga’s move to the farm.

. Administrative Code of the City of New York § 14-115 reads as follows:
“a. The commissioner shall have power, in his or her discretion, on conviction by the commissioner, or by any court or officer of competent jurisdiction, of a member of the force of any criminal offense ... to punish the offending party ... by dismissal from the force ....
“b. Members of the force, except as elsewhere provided herein, shall be fined, reprimanded, removed, suspended or dismissed from the force only on written charges made or preferred against them, after such charges have been examined, heard and investigated by the commissioner . . . .”
Thus, the Administrative Code provides for a departmental disciplinary process applicable to convictions for “any criminal offense,” in effect, for a criminal offense other than a conviction that automatically terminates employment, i.e:, a felony or an “oath of office” misdemeanor. Because a local law cannot change or affect a state statute, Administrative Code § 14-115 cannot be read to require the Commissioner to bring formal written charges and grant a hearing to an officer, convicted of a felony or an “oath of office” misdemeanor. Consequently, the Administrative Code procedural protections apply only where punishment is sought of a current employee; they are not applicable to a former employee whose office automatically became vacant upon conviction pursuant to state law.

. In Matter of Duffy, the Court of Appeals held that a misdemeanor conviction for conduct outside the line of duty is considered as involving a violation of the oath of office “only if the violation is apparent from the Penal Law’s definition of the crime.” (Matter of Duffy, 81 NY2d at 134.) The conviction in Matter of Duffy was at trial; thus, there were no specific factual findings. The Duffy court therefore cautioned that reliance must be placed on the statutory elements of the offense, rather than on the allegations in the accusatory instrument. The Duffy court’s holding that a crime “involving a violation of the oath of office” should be interpreted “in such a way that no factual inquiry is needed to trigger automatic dismissal” (id. at 133) should be viewed in that context.
However, because petitioner’s crime occurred while on duty, and because the prosecution was resolved by a guilty plea, the court’s analysis here need not be limited solely to the elements of the offense. Although the Court of Appeals cautioned that Public Officers Law § 30 (1) (e) should not be construed “as giving the Commissioner unbridled discretion to make a fact-based determination about dismissal but foreclosing the opportunity to develop the facts” (Matter of Duffy, 81 NY2d at 133), such concern is not present here. The additional matter that this court is taking into consideration comes from petitioner’s allocution on the record under oath, where petitioner made specific factual admissions.

. Indeed, it is undisputed that the statement was incorrect when it was written. (Tr of Feb. 12, 2012 oral argument at 23.)